# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **GREG TOLAR,** *et al,* | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:13-cv-00132-MHH** |
| | } | |
| **MARION BANK AND TRUST, CO.,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION AND ORDER

This employment discrimination case is before the Court on defendant
Marion Bank and Trust's motions for summary judgment on plaintiffs Greg, Reid,
and Andrew Tolar's claims of third-party retaliation under Title VII. The Tolars
assert that Marion Bank took a series of adverse actions against them in retaliation
for a family member's charge of discrimination with the EEOC and subsequent
Title VII lawsuit against the bank. For the reasons described below, the Court
grants Marion Bank's motions for summary judgment.

## I.    STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is
no genuine dispute as to any material fact and the movant is entitled to judgment as
a matter of law." Fed. R. Civ. P. 56(a). To demonstrate that there is a genuine

1

dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

"A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."). Even if the Court doubts the veracity of the evidence, the Court cannot make credibility determinations of the evidence at the summary judgment stage; that is the work of a jury. *Feliciano*, 707 F.3d at 1252 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences in the light most favorable to the non-moving party. *Asalde v. First Class Parking Sys. LLC*, 898

F.3d 1136, 1138 (11th Cir. 2018). Accordingly, the Court presents the summary judgment evidence in the light most favorable to the Tolars.

## II. SUMMARY JUDGMENT EVIDENCE

This case arises out of another Title VII lawsuit in which Greg Tolar's daughter, Ragan Youngblood, asserted claims of sexual harassment and retaliation against Marion Bank and Trust, Co., her former employer, and Conrad Taylor, the president of the bank. Reid Tolar is Greg Tolar's son and Ms. Youngblood's brother, and Andrew Tolar is Greg Tolar's brother and Ms. Youngblood's uncle. (Doc. 78-2, p. 7, tr. p. 23; Doc. 80-1, p. 4, tr. p. 11). The Tolars contend that Ms. Youngblood's complaints of sexual harassment precipitated a series of retaliatory actions by Marion Bank and against the Tolars. Before discussing the evidence relating to the plaintiffs' retaliation claims, the Court first must address the bank's objections to some of that evidence.

### A. **Marion Bank's Evidentiary Objections**

Rule 56 allows a party seeking or opposing summary judgment to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Objections under Rule 56(c)(2) function like trial objections adjusted for the pretrial setting, and "[t]he burden is on the proponent [of the challenged evidence] to show that the material is admissible as presented or to explain the admissible form that is

anticipated." Fed. R. Civ. P. 56(c)(2), advisory committee note (2010 amendments). Rule 56(c)(2) enables a party to submit evidence that ultimately will be admissible at trial in an inadmissible form at the summary judgment stage. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012). A district court has broad discretion to determine at the summary judgment stage what evidence it will consider pursuant to Rule 56(c)(2). *See Green v. City of Northport*, 2014 WL 1338106, at *1 (N.D. Ala. March 31, 2014).

In opposition to Marion Bank's motions for summary judgment, the Tolars submitted a declaration from Ms. Youngblood. *See* Docs. 95, 95-1. The Tolars then moved to amend the declaration. (Doc. 95). Marion Bank objects to the new information contained in Ms. Youngblood's amended declaration as overly prejudicial. (Doc. 96). Marion Bank also challenges certain depositions, declarations, and affidavits that the Tolars submitted, arguing that the evidence is irrelevant, lacks foundation, and contradicts prior sworn testimony. (Doc. 100).[1] For the reasons described below, the Court will consider the challenged evidence in resolving Marion Bank's motions for summary judgment.

---

[1] Marion Bank styled its objection as a motion to strike or, in the alternative, notice of objections to inadmissible evidence. The Court construed Marion Bank's motion to strike as an objection to the admissibility of summary judgment evidence because motions to strike no longer are appropriate. (Docs. 101, 102); *see* Fed. R. Civ. P. 56(c)(2) advisory committees note (2010 amendments) ("There is no need to make a separate motion to strike."); *Campbell v. Shinseki*, 546 Fed. Appx. 874, 879 (11th Cir. 2013) ("The plain meaning of [amended Rule 56(c)(2)] show[s] that objecting to the admissibility of evidence supporting a summary judgment motion is now a part of summary judgment procedure, rather than a separate motion to be handled preliminarily . . . .").

### 1. Ms. Youngblood's Deposition and Affidavit from her Title VII Case. (Docs. 91-1, 91-3).

Marion Bank argues that Ms. Youngblood's deposition and affidavit from her underlying Title VII case are irrelevant to this retaliation action because her testimony addresses her allegations of employment discrimination, none of which form the basis of this action or address a material fact in this action. (Doc. 100, pp. 3-5). Even though Ms. Youngblood is not a plaintiff in this lawsuit, her testimony and allegations are relevant because they describe the conduct that allegedly caused Marion Bank to retaliate against Ms. Youngblood by taking actions adverse to her father, brother, and uncle. Ms. Youngblood's testimony thus provides context for the Court's analysis of Marion Bank's behavior following Ms. Youngblood's termination from Marion Bank.

Marion Bank's objection to Ms. Youngblood's affidavit is particularly unpersuasive because Marion Bank attempts to use the affidavit to prove a material fact in dispute, namely whether Greg Tolar acted on behalf of his daughter as her attorney when she filed her EEOC charge. Marion Bank cannot object to the evidence as irrelevant while simultaneously using it to try to establish its defense.

### 2. Ms. Youngblood's Declaration in this Case. (Doc. 95-1).

In support of their claims, the Tolars rely not only on Ms. Youngblood's affidavit from her underlying Title VII suit but also on an amended declaration that Ms. Youngblood provided for this case. (Doc. 95-1, pp. 3-7). Marion Bank argues

that Ms. Youngblood's amended declaration is irrelevant. (Doc. 100, p. 5). The Court disagrees.

The amended declaration includes the following paragraphs that do not appear in Ms. Youngblood's original declaration:

> 21. I would not have pursued my Title VII matter knowing my father, brother and uncle would be sued.
>
> 22. I would not have pursued my Title VII matter knowing my father would file bankruptcy because he lost his business due to my complaints.
>
> 23. I would not have pursued my Title VII matter knowing my brother would have to answer to the Alabama State Bar for a fraud action filed against him because of the Bank retaliating against me. After three years of law school my complaints against Conrad Taylor almost prohibited him from taking the Bar exam because of the Bank's fraud action.
>
> 24. I would not have pursued my Title VII action knowing that my uncle Andrew Tolar would also be sued for fraud.
>
> 25. I filed my EEOC Charge of Discrimination on my own and without assistance from Greg Tolar only after I was told the Bank was not going to conduct an internal investigation.

(Doc. 95-1, p. 7, ¶¶ 21-25).

Marion Bank argues that the new information in the amended declaration is "contrary to undisputed record evidence and would otherwise prejudice Defendant." (Doc. 96, p. 2, ¶ 4; Doc. 100, p. 5, n. 7). As support for this contention, Marion Bank points to Ms. Youngblood's affidavit in which she stated that her father "met with Mr. Randy Richardson, the Chairman of the Board of

Directors, as my attorney." (Doc. 100, p. 6) (citing Doc. 91-3, p. 9). Marion Bank also cites Greg's deposition testimony from his daughter's underlying Title VII suit, in which he stated that he told Mr. Richardson during this meeting that "we would be filing an EEOC charge on her behalf." (Doc. 100, p. 6) (citing Doc. 78-7, p. 56). The bank invokes the sham affidavit rule and asks the Court to disregard paragraph 25 of Ms. Youngblood's declaration on that basis.

Generally, a district court cannot weigh evidence or determine the credibility of evidence at the summary judgment stage. Consistent with this rule, at the summary judgment stage, a court generally must accept and credit the information that the non-movant provides. *See United States v. Stein*, 881 F.3d 853, 854 (11th Cir. 2018) ("[A]n affidavit which satisfies Rule 56 of the Federal Rules of Civil Procedure may create an issue of material fact and preclude summary judgment even if it is self-serving and uncorroborated."). But this general rule does not apply when a party attempts to create a material factual dispute "with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). Under this exception to the general rule regarding credibility, sometimes called the "sham affidavit rule," *Liebman v. Metro. Life Ins. Co.*, 708 Fed. Appx. 979, 982 (11th Cir. 2017), a court must "find some inherent inconsistency between

an affidavit and a deposition before disregarding the affidavit." *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1316 (11th Cir. 2007).

In considering Marion Bank's objection, the Court will disregard Greg Tolar's testimony because under the sham affidavit rule, the Court must determine whether Ms. Youngblood's testimony contradicts her own prior testimony, not another person's prior testimony. *Van T. Junkins & Assocs.*, 736 F.2d at 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue[.]"). As to Ms. Youngblood's declaration that she filed her EEOC charge on her own, the statement does not directly contradict Ms. Youngblood's affidavit testimony that her father met with Mr. Richardson as her attorney. The two are not mutually exclusive. The evidence shows that Ms. Youngblood handwrote her EEOC charge, *see* Doc. 95-1, pp. 9-10, and there is no inconsistency that compels the Court to disregard paragraph 25 of the amended declaration.

### 3. Mitchell Livingston's Deposition from Ms. Youngblood's Underlying Title VII Case. (Doc. 91-18).

Marion Bank objects to the Court's consideration of Mr. Livingston's deposition from Ms. Youngblood's underlying Title VII case on the grounds that it is irrelevant. (Doc. 100, pp. 7-8). Mr. Livingston was Ms. Youngblood's husband when the critical events in this case took place. The Court finds Mr. Livingston's

declaration relevant for the same reasons it found Ms. Youngblood's testimony in her deposition and affidavit from her underlying Title VII case relevant.[2]

**B. <u>The Evidence in the Light Most Favorable to the Tolars</u>**

- **Ms. Youngblood's Employment with and Title VII Lawsuit against Marion Bank and Conrad Taylor**

Marion Bank and Trust, Co. is a financial institution located in Marion, Alabama. (Doc. 78-16, p. 2, ¶ 3; Doc. 78-17, p. 2, ¶ 3). The bank provides personal and commercial services. (Doc. 78-16, p. 2, ¶ 3; Doc. 78-17, p. 2, ¶ 3). Ms. Youngblood worked for Marion Bank from February 11, 2008 until her termination on September 16, 2008. (Doc. 78-16, p. 4, ¶ 9; Doc. 78-17, p. 4, ¶ 9). Conrad Taylor served as the bank's owner and CEO, and Preston Nichols served as the bank's vice-president during this time period. (Doc. 78-16, p. 2, ¶ 2; Doc. 78-17, p. 2, ¶ 2).[3] Ms. Youngblood was Mr. Taylor's personal assistant. (Doc. 91-3, p. 2). Before hiring Ms. Youngblood, Mr. Taylor told her that no one else at the bank had greater authority than him or could make final decisions. (Doc. 91-3, p. 2).

In her Title VII action against the bank and Mr. Taylor, Ms. Youngblood alleged that during her employment with Marion Bank, Mr. Taylor sexually

---

[2] Because context is important to a discussion of the bank's last objection, the Court addresses that objection below.

[3] Mr. Taylor still owns the bank and serves as its CEO. (Doc. 78-17, p. 2, ¶ 2). Since October 2017, Mr. Nichols has served as the bank's chief operating officer. (Doc. 78-16, p. 2, ¶ 2).

harassed her by making inappropriate comments and inquiries regarding her dress and appearance, her sex life, and the status and nature of her relationship with her husband at the time, Mr. Livingston, and by making unwanted physical advances. *See* Doc. 91-3, pp. 3-9. Ms. Youngblood tried to ignore Mr. Taylor's behavior, but in early September 2008, Ms. Youngblood objected to Mr. Taylor's request to "make him happy by having sex with him" and threatened to inform his wife. (Doc. 91-3, p. 6).

On September 9, 2008, less than a week after Ms. Youngblood made the threat to Mr. Taylor, he called her into his office to discuss a past due journal in Ms. Youngblood's account. (Doc. 91-3, p. 6). During the meeting, Mr. Taylor, "[w]ithout warning . . . changed the subject in the middle of [the] conversation" and began making "hostile remarks" to Ms. Youngblood. (Doc. 91-3, p. 6). Mr. Taylor told Ms. Youngblood that she "carried too much emotional stress" and directed her to go home immediately and take one week's vacation." (Doc. 91-3, p. 6). During that week, Mr. Taylor terminated Ms. Youngblood when she and Mr. Livingston stopped by the bank to check the balance of their account. (Doc. 91-3, p. 7). Mr. Taylor did not provide an explanation for the termination. (Doc. 91-3, p. 7).

In October 7, 2008, Ms. Youngblood filed a handwritten EEOC charge against Marion Bank, alleging sexual harassment and retaliation under Title VII.

(Doc. 95-1, pp. 9-10). The EEOC asked Ms. Youngblood to resubmit a typed EEOC charge. (Doc. 95-1, p. 4, ¶ 8). On October 17, 2008, the EEOC mailed a notice of charge of discrimination to Mr. Taylor. (Doc. 95-1, pp. 15-16). On October 20, 2008, Ms. Youngblood submitted a typed EEOC charge. (Doc. 95-1, pp. 12-13). On November 18, 2008, Greg Tolar sent the following letter to the EEOC on behalf of his daughter:

> Please be advised that I represent Ragan as her legal counsel as well as being her father. Please direct any future communication to me at the above address and phone number.

(Doc. 78-10, p. 75).

Ms. Youngblood filed suit against the bank and Mr. Taylor on April 21, 2011. Greg Tolar did not represent Ms. Youngblood in her lawsuit. The parties settled, and the Title VII action was dismissed with prejudice on August 11, 2014. *Ragan Livingston v. Marion Bank and Trust Co., et al.*, 2:11-CV-01369-JEO (Docs. 1, 63).

- **Greg Tolar's Work for Marion Bank**

Greg Tolar is a licensed Alabama attorney. (Doc. 78-7, pp. 9-10). In January 1995, he opened a law firm in Selma, Alabama and remained there until 2005 when he relocated his practice to Marion, Alabama. (Doc. 78-1, pp. 7, 32-33, tr. pp. 24, 124-25). His legal work in Selma initially consisted of real estate, criminal defense, and probate work, but eventually he began to focus on his real

estate practice. (Doc. 78-1, pp. 8, 10, tr. pp. 27, 33). Greg Tolar also served as a part-time municipal judge in Selma from 1998 to 2004. (Doc. 78-1, p. 10, tr. p. 35).

Greg's relationship with Marion Bank began in 2004 when realtors Sammy Rinehart and Kay Beckett began referring real estate closings to Greg. (Doc. 78-1, p. 27, tr. pp. 102-03; Doc. 78-7, p. 18).[4] After Greg moved his law office from Selma to Marion in 2005, Greg began receiving legal work directly from Marion Bank. (Doc. 78-1, pp. 28, 32, tr. pp. 108, 125). Mr. Taylor approached Greg several times to ask if he would be interested in conducting all of Marion Bank's legal work, but Greg declined. (Doc. 78-1, pp. 28-29, tr. pp. 108-10). Greg's work for Marion Bank during this time period consisted primarily of real estate closings, foreclosures, and bankruptcy proceedings. (Doc. 78-1, p. 29 tr. p. 111; Doc. 78-10, p. 18).

- **Greg Tolar's Defaulted Loans from Marion Bank**

On February 1, 2008, before Marion Bank hired Ms. Youngblood, the bank assumed an unsecured $98,416.50 line of credit that Greg Tolar had with Regions Bank. (Doc. 78-11, pp. 32-33; Doc. 78-16, pp. 7-8, ¶ 18). The line of credit had a maturity date of January 31, 2009. (Doc. 78-11, pp. 32-33; Doc. 78-16, pp. 7-8, ¶ 18). Greg Tolar did not pay the loan by the maturity date. (Doc. 78-16, pp. 7-8, ¶

---

[4] Because all three of the plaintiffs are Mr. Tolar, the Court often refers to each plaintiff by his first name.

12

18; Doc. 78-1, p. 19, tr. pp. 69, 72). In March 2009, Marion Bank agreed to extend the maturity date of the loan to January 30, 2010 in exchange for payment of a portion of the interest due on the loan. (Doc. 78-11, pp. 34-36; Doc. 78-16, pp. 7-8, ¶ 18). Mr. Nichols testified that the bank agreed to provide the extension "for less than 50 percent of the interest, which is outside of our policy, and . . . I had to get permission from the loan committee to do so." (Doc. 78-3, p. 44, tr. p. 171). Greg failed to repay the loan by January 30, 2010. (Doc. 78-16, pp. 7-8, ¶ 18; Doc. 78-1, p. 19, tr. pp. 69, 72).

On March 8, 2008, a month after Ms. Youngblood went to work for Marion Bank, Mr. Livingston obtained an unsecured $24,787.28 loan from the bank. (Doc. 78-11, pp. 44-47; Doc. 78-16, p. 8, ¶ 19). Greg co-signed the loan. (Doc. 78-11, p. 47; Doc. 78-7, p. 14). Mr. Livingston defaulted on the loan. (Doc. 78-16, p. 8, ¶ 19; Doc. 78-7, pp. 13-16).

- **Greg's relationship with Marion Bank Following Ms. Youngblood's Termination**

In September 2008, two days after Marion Bank fired Ms. Youngblood, Greg and his wife, Lori Tolar, visited the bank and spoke with the chairman of the bank's board, Randy Richardson. (Doc. 78-1, pp. 35-36, tr. pp. 136-37; Doc. 78-7, pp. 53-55). Because Mr. Richardson was the board chairman, Greg and Lori felt that Mr. Richardson was their only option because everyone else was subordinate to Mr. Taylor. (Doc. 78-7, p. 57). Greg and Lori complained that Mr. Taylor had

sexually harassed their daughter and asked Mr. Richardson to have the bank investigate their daughter's allegations against Mr. Taylor. (Doc. 78-1, p. 36, tr. p. 137; Doc. 78-7, pp. 53-55). Greg and Lori also asked the bank to place their daughter on administrative paid leave and keep her insurance in force during the investigation. (Doc. 78-1, p. 36, tr. p. 137; Doc. 78-7, pp. 54-55). Greg informed Mr. Richardson that Ms. Youngblood would be filing an EEOC charge. (Doc. 78-1, p. 37, tr. p. 142; Doc. 78-7, p. 56).[5]

During the meeting, Mr. Richardson asked about the legal work that Greg was doing on behalf of Marion Bank. (Doc. 78-7, pp. 55-56). Greg responded that he was in the process of completing three foreclosures. (Doc. 78-7, p. 56). Greg asked Mr. Richardson if Marion Bank wanted Greg to finish the foreclosures. (Doc. 78-3, p. 21, tr. pp. 79-80). At the end of their meeting, Mr. Richardson informed Greg and Lori that he would get back to them regarding their daughter's complaints and the three pending foreclosures. (Doc. 78-1, p. 36, tr. p. 137; Doc. 78-7, pp. 55-57).

---

[5] In his deposition in his daughter's underlying Title VII action, Greg testified that he filed the EEOC charge on behalf of his daughter and that he told Mr. Richardson that "we would be filing an EEOC charge on her behalf." (Doc. 78-7, pp. 17, 56). He also testified that he first noticed he stopped receiving work from Marion Bank "within a month . . . of September when Ragan filed her EEOC charges." (Doc. 78-7, p. 21). In his deposition taken in this case, Greg denied telling Mr. Richardson that he would be representing his daughter. (Doc. 78-1, p. 37, tr. p. 142) ("We didn't talk about anything about me assisting her. We just told him that an EEOC charge would be forthcoming ... [w]e didn't say who it was coming from."). In her amended declaration, Ms. Youngblood stated that she filed her EEOC charge on her own, without assistance from her father. (Doc. 95-1, p. 7, ¶ 25). For purposes of the bank's summary judgment motions in this case, the Court accepts the version of these facts that favors Greg.

The next day, Mr. Richardson called Greg and explained that Marion Bank would not investigate Ms. Youngblood's allegations of sexual harassment against Mr. Taylor because the bank believed Mr. Taylor's version of the events. (Doc. 78-1, p. 36, tr. pp. 137-38; Doc. 78-7, pp. 57-59). Mr. Richardson instructed Greg to complete the three foreclosures that he was processing on behalf of the bank, and Mr. Richardson told Greg that his contact at the bank for the foreclosures would be Mr. Nichols, not Mr. Taylor. (Doc. 78-7, p. 58; Doc. 78-3, p. 21, tr. p. 79). At no point during the conversations did Mr. Richardson indicate that Marion Bank would no longer refer legal work to Greg because his daughter's allegations of sexual harassment constituted a conflict of interest. *See* Doc. 78-1, pp. 35-37, tr. pp. 136-38, 142; Doc. 78-7, pp. 53-57; Doc. 91-16, pp. 57-59. Prior to these conversations, Greg and Mr. Richardson had not discussed Ms. Youngblood except on a few occasions when Mr. Richardson praised Ms. Youngblood's work. (Doc. 78-7, pp. 59-60).

A few days later, Mr. Nichols met with Greg in Greg's office to discuss one of Greg's three remaining foreclosures. (Doc. 78-1, p. 36, tr. pp. 138-39). During the meeting, Mr. Nichols expressed his disbelief in Ms. Youngblood's allegations. (Doc. 78-1, p. 36, tr. p. 139). Greg changed the topic and returned the discussion to the foreclosure that Greg was handling. (Doc. 78-1, p. 36, tr. p. 139). Greg and

Mr. Nichols did not discuss Ms. Youngblood's allegations again. (Doc. 78-1, p. 36, tr. p. 139).

- **Marion Bank's Termination of its Relationship with Greg**

Shortly after Greg and Lori met with Mr. Richardson, the Bank stopped referring legal work to Greg. (Doc. 78-3, pp. 19, 38, tr. pp. 69-70, 148; Doc. 78-7, p. 21; *see* Doc. 78-10, p. 21). Mr. Nichols testified that Marion Bank stopped referring legal work to Greg because "he was adversarial to [the bank] in another lawsuit." (Doc. 78-3, p. 21, tr. p. 78). Mr. Nichols also cited performance issues with Greg. (Doc. 78-3, p. 21, tr. p. 78). Marion Bank did not warn Greg in advance or otherwise indicate that it would no longer refer legal work to him. (Doc. 78-1, pp. 37, 40 tr. pp. 143, 154-55). Until Marion Bank ended its business relationship with Greg, the bank did not inform Greg that he was not performing up to the bank's standard. (Doc. 78-3, pp. 74-75, tr. pp. 292-93).

In October 2008, shortly after Marion Bank stopped referring legal work to Greg, the board created and the bank adopted a list of attorneys approved to conduct legal work on behalf of the bank. (Doc. 78-3, pp. 38-39, tr. pp. 146-49). Greg was not included on the list. (Doc. 78-11, p. 25). Before Marion Bank adopted the list of approved attorneys, it would assign its legal work to a pool of five attorneys, including Greg. (Doc. 78-3, p. 17, tr. p. 62). Without a specific

procedure or policy in place, Mr. Taylor chose the attorney that the bank would use.  (Doc. 78-3, pp. 17-19, tr. pp. 62, 68-69).

By the time Greg and Marion Bank parted ways in the fall of 2008, the bank had paid Greg about $31,000 since 2005; the bank was paying Greg fees of approximately $3,500 per month on average.  (Doc. 78-1, p. 39, tr. p. 151; *see* Doc. 78-10, pp. 16-21).  In 2009, Greg moved his law practice to Prattville, Alabama due to the loss of income from the bank.  (Doc. 78-1, p. 46, tr. p. 178).  Greg estimated that he was grossing about $160,000 per year when he left Marion.  (Doc. 78-1, p. 12, tr. p. 43).

- **Marion Bank's Efforts to Collect on Defaulted Loans**

On July 1, 2009, Marion Bank initiated a collection lawsuit in the Circuit Court of Perry County against Mr. Livingston and Greg for the defaulted $24,787.28 loan for which Greg had co-signed.  (Doc. 78-11, pp. 42-43).  As to Greg's $98,416.50 line of credit that was in default, after unsuccessfully trying to reach Greg by phone on February 15 and 18, 2010, (Doc. 78-3, pp. 47-48, tr. pp. 184-85), Mr. Nichols emailed him on February 26, 2010:

> i [sic] have been trying to reach you regarding the above mentioned loan.  the loan was due on jan. 30th.  please let us know your intentions for repayment of this loan.  thank you.

(Doc. 78-11, p. 54).  Two days later, Greg responded: "preston; wanted to let you know i [sic] received your email."  (Doc. 78-11, p. 26).  On March 15, 2010,

Marion Bank filed a collection lawsuit in the Circuit Court of Perry County against Greg for the $98,416.50 loan. (Doc. 78-10, pp. 6-7). Greg does not dispute the defaulted debt and does not believe that Marion Bank behaved improperly in filing a collection lawsuit. (Doc. 78-1, p. 19, tr. p. 72).

On September 9, 2010, the Perry County Circuit Court entered judgment in Marion Bank's favor against Greg and Mr. Livingston, and ordered Greg and Mr. Livingston to pay the bank $28,687.67 in principal and accrued interest and $4,303.15 in attorney fees. (Doc. 78-11, pp. 51-52). The same month, the Perry County Circuit Court entered a $111,382.95 judgment in favor of Marion Bank and against Greg on his $98,416.50 debt. (Doc. 78-7, pp. 12-15).

After obtaining judgments on both loans, Marion Bank pursued garnishments against Greg's and Mr. Livingston's wages. (Doc. 78-16, pp. 9-10, ¶ 23). On October 13, 2010, the Perry County Circuit Clerk issued a garnishment against Mr. Livingston, naming Pepsi-Cola Bottle Co. of Selma, Mr. Livingston's employer at the time, as garnishee. (Doc. 78-16, pp. 9-10, ¶ 23; p. 149). The same day, the Perry County Circuit Clerk issued a garnishment against Greg, naming the Tolar Law Firm, LLC as garnishee. (Doc. 78-16, pp. 9-10, ¶ 23; pp. 151-52). Unbeknownst to Marion Bank, Greg had dissolved The Tolar Law Firm, LLC on October 15, 2009. (Doc. 78-16, pp. 150, 153; pp. 9-10, ¶ 23). On November 16, 2010, following the failed execution of garnishment against Greg's wages, Greg

testified through post-judgment interrogatories that he had no assets to pay Marion Bank's judgment against him. (Doc. 78-18, pp. 71-75).

As of February 2012, Greg had not satisfied the judgment against him. (Doc. 78-18, p. 4, ¶¶ 11-12). Marion Bank's efforts to collect lay dormant until February 8, 2012, when Bradley Arant Boult Cummings LLP made an appearance on behalf of Marion Bank in the collection action against Greg. (Doc. 78-18, p. 5, ¶ 15). At the time, lawyers in the Bradley Arant firm were defending Marion Bank and Mr. Taylor in Ms. Youngblood's Title VII action against the bank and Mr. Taylor. Bradley Arant did not represent Marion Bank when the bank filed the collection actions against Greg and Mr. Livingston, and Bradley Arant did not represent the bank when the bank obtained judgments in the two collection actions. (Doc. 78-18, p. 4, ¶ 11).

- **The Fraudulent Transfer Action**

When Greg defaulted on his loans with Marion Bank, Greg and Andrew were trustees and income beneficiaries of an irrevocable trust formed by their father, James Tolar. (Doc. 78-12, pp. 86-96). The controlling trust agreement provided that "[t]he entire net income from the Trust property shall be available to MARTHA W. TOLAR, wife of the Grantor, for as long as she shall live." (Doc. 78-12, p. 89, ¶ 1). The trust agreement established that during Martha Tolar's lifetime, "no income derived from this trust shall be paid to Grantor's children or

grandchildren by the Trustees unless said Trustees are instructed to do so, in writing, by the said Martha W. Tolar." (Doc. 78-12, p. 89, ¶ 3). Upon Martha Tolar's death, the income from the trust was to be distributed to Greg, Andrew, and James Tolar's two other children. (Doc. 78-12, pp. 89-90, ¶ 4). The trust agreement contained the following spendthrift provision:

> The interest of any beneficiary, primary or otherwise, in the corpus or income of this trust shall not be subject to assignment, alienation, pledge, attachment, or claims of creditors, and shall not otherwise be voluntarily or involuntarily alienated or encumbered by such beneficiary.

(Doc. 78-12, p. 90). The trust agreement provided that the trust "shall remain in full force and effect until all of grantor's children are deceased at which time it will terminate" and "the entire corpus of this Trust … shall be divided and distributed equally among Grantor's grandchildren." (Doc. 78-12, p. 90, ¶ 5).

On February 26, 2010, Greg, acting as a trustee and as the Tolar family attorney, executed an addendum to the Tolar Family Trust. (Doc. 78-11, pp. 84-87). Greg made many changes to the trust agreement through the addendum. First, Greg restructured the trustees. The addendum designated Greg, Andrew, and their brother, James M. Tolar, as trustees, and it eliminated the provision that allowed the grandchildren of the trustees to become trustees upon meeting certain conditions. (Doc. 78-11, p. 84, ¶¶ 1-2). The addendum also designated Reid as a successor trustee in the event that none of the trustees were able to serve. (Doc.

78-11, pp. 84-85, ¶ 3).   Second, Greg restructured the beneficiaries.   The addendum replaced all references to Martha W. Tolar as a beneficiary with the names of James M. Tolar, Andrew F. Tolar, Reid G. Tolar, and Dean R. Tolar and divided the corpus of the trust among them at 26.67%, 26.67%, 26.66%, and 20%, respectively.   (Doc. 78-11, p. 85, ¶ 4.a-b).   The addendum also altered the provision requiring that the trust remain in effect until certain conditions were met by granting the new trustees the power to dissolve the trust at any time.   (Doc. 78-11, p. 85, ¶ 4.f).   The addendum did not remove the spendthrift provision.   *See* Doc. 78-11, pp. 84-87.

On December 25, 2011, Greg's father, the grantor under the trust agreement, died.   (Doc. 78-12, p. 57, ¶ 6).   In January 2012, Marion Bank learned that Greg had executed an addendum to the family trust.   (Doc. 78-3, p. 50, tr. p. 194).   Marion Bank contacted Chris Glenos, a partner at Bradley Arant, to examine whether the bank had collection options relating to the trust addendum.   (Doc. 78-18, p. 4, ¶ 11).   Mr. Glenos testified that he was not involved in Ms. Youngblood's Title VII lawsuit and "did not review any depositions, discovery, or pleadings from that action as part of my representation of Marion Bank or at any other time." (Doc. 78-18, p. 4, ¶ 11).

On February 9, 2012, after Greg learned of Bradley Arant's appearance in the Marion Bank's collection action against him, Greg emailed Mr. Glenos and

Josh Johnson, an associate with Bradley Arant at the time, stating that he is "willing to try to settle" the collection matter and asked if the bank was "able to accept monthly payments or if they are looking for a lump sum settlement." (Doc. 78-11, p. 55). The following day, Mr. Glenos replied to Greg and informed Greg that Marion Bank had filed a complaint under the Alabama Fraudulent Transfer Act against the James A. Tolar, Jr. Family Trust and Reid Tolar and had moved for a temporary restraining order. (Doc. 78-11, p. 55; Doc. 78-1, p. 41, tr. p. 158). Mr. Glenos requested that Greg advise whether the trustees and Reid would consent to the requested restraining order in lieu of an emergency hearing. (Doc. 78-11, p. 55). Mr. Glenos explained the nature of the claim:

> Also, please note that the bank is not seeking to restrain or enjoin the sale of any Trust assets to third parties – only the payment or subsequent transfer of any distributions by the Tolar Family Trust attributable to your beneficial interest in the Trust that were ostensibly assigned to Reid Tolar pursuant to the February 2010 Addendum to the Trust Agreement.

(Doc. 78-11, p. 55). Mr. Glenos concluded his email by addressing Greg's inquiry regarding settlement of the collection matter: "You are welcome to give me a call if you have some proposal in mind for the payment of the bank's final judgment against you." (Doc. 78-11, p. 55).

In its fraudulent transfer claim, Marion Bank alleged that Greg had restructured the trust and assigned his beneficial interest to his son to frustrate the bank's ability to collect the outstanding judgment against Greg. (Doc. 78-18, pp,

32-37). Marion Bank sued Reid individually and Greg and Andrew in their roles as trustees. (Doc. 78-18, p. 32). On February 13, 2012, three days after Marion Bank filed the fraudulent transfer action and moved for a temporary restraining order, the Perry County Circuit Clerk issued a garnishment against Greg, naming Reid Tolar and the family trust as garnishees. (Doc. 78-18, pp. 79-80).

On March 4, 2012, Greg emailed Mr. Glenos and Mr. Johnson informing them that he had filed a response to their motion for a temporary restraining order. (Doc. 78-12, p. 110). Greg also offered to settle the outstanding judgment against him for $40,000. (Doc. 78-12, p. 110). Neither Mr. Johnson nor Mr. Glenos responded to Greg's email offer. (Doc. 78-12, p. 119). On March 7, 2012, Greg emailed Mr. Johnson and Mr. Glenos again, making the same offer. (Doc. 78-12, p. 119).

On March 5, 2012, Marion Bank obtained a temporary restraining order that enjoined Reid and the trust from making distributions to Greg or Reid pursuant to the trust addendum. (Doc. 78-18, pp. 115-116). Following the entry of the TRO, on March 9, 2012, Mr. Johnson emailed Greg with a response to his offer to settle the matter for $40,000. (Doc. 78-18, p. 130). Mr. Johnson stated that Marion Bank was not in a position to engage in settlement discussions or make a counteroffer without conducting discovery. (Doc. 78-18, p. 130). Mr. Johnson proposed that the parties move to continue the preliminary injunction hearing set

for March 20, 2012 and to extend the restraining order until the hearing to allow the parties to conduct discovery. (Doc. 78-18, p. 130). Greg consented to Mr. Johnson's proposal, and the parties submitted a motion to this effect on March 14, 2012. (Doc. 78-18, p. 120). The following day, the circuit court granted the parties' request and extended the restraining order until the parties completed discovery. (Doc. 78-18, p. 126).

When Marion Bank filed its fraudulent transfer action against Reid and the trust, Reid was a third-year law student at Birmingham Law School and was planning to sit for the Alabama bar exam. (Doc. 78-2, pp. 4, 12, tr. pp. 12, 43). Because Reid was included as a defendant in the fraudulent transfer action, he had to report the lawsuit to the state bar's Character and Fitness Committee. Reid ultimately sat for and passed the Alabama bar after graduating in May of 2012. Reid has been working at Tolar & Tolar since September of 2012. (Doc. 78-2, pp. 4, 10, tr. pp. 12, 35). Reid has not had any bar complaints since becoming a lawyer. (Doc. 78-2, p. 12, tr. p. 41).

- **Greg's Chapter 13 Bankruptcy Petition**

On April 19, 2012, Greg filed for Chapter 13 bankruptcy in the United States Bankruptcy Court for the Middle District of Alabama. (Doc. 78-19, pp. 3-50; Doc. 78-1, p. 17, tr. p. 61). At the time, Sabrina McKinney was a senior staff attorney for the Standing Chapter 13 Trustee in the Middle District of Alabama. (Doc. 91-

14, p. 2, ¶ 3). Before he filed his bankruptcy petition, Greg let Ms. McKinney and the Standing Chapter 13 Trustee know that he would be filing for Chapter 13 protection. (Doc. 91-14, p. 3, ¶ 5). Greg informed Ms. McKinney that he would be filing a "100%" Chapter 13 plan to repay the Marion Bank debt in full. (Doc. 91-14, p. 3, ¶ 5).

After Greg filed for bankruptcy, but before he submitted his Chapter 13 plan, Mr. Johnson contacted Ms. McKinney. (Doc. 78-18, pp. 7-8, ¶ 23; Doc. 91-14, pp. 3-4, ¶¶ 6-7). Mr. Johnson proposed that the Trustee's office retain Bradley Arant to represent the Trustee and indicated that he was under the impression that Greg did not intend to satisfy his debt. (Doc. 91-14, pp. 3-4, ¶ 6). Ms. McKinney testified that the law firm's call and request were "out of the ordinary" because she "had never had a law firm solicit [her] to represent the Trustee as a client in an individual preference action." (Doc. 91-14, p. 4, ¶ 7). Ms. McKinney was unsure how Mr. Johnson was aware of Greg's bankruptcy petition as his bankruptcy petition "was so new that it had not been entered into the trustee's computer system." (Doc. 91-14, p. 4, ¶ 7). She also was unsure why Mr. Johnson believed that Greg did not intend to repay his debt because Greg had not filed his bankruptcy plan yet. (Doc. 91-14, p. 4, ¶ 7).[6]

---

[6] Marion Bank argues that Ms. McKinney's declaration constitutes inadmissible opinion evidence and lacks foundation because it contradicts Marion Bank's expert's testimony. (Doc. 100, pp. 6-7). Marion Bank takes issue with Ms. McKinney's characterization of Marion Bank's

As to why Bradley Arant contacted the Bankruptcy Trustee's office, Mr. Glenos testified:

> When a debtor files a Chapter 7 or 13 bankruptcy case, any pending fraudulent transfer lawsuits relating to the debtor are automatically stayed and become subject to the oversight and/or control of the bankruptcy trustee. For this reason, after Greg Tolar filed for bankruptcy, our firm contacted the Chapter 13 bankruptcy trustee's office (Curtis Reding) regarding the pending fraudulent transfer claim. In my experience, it is customary for creditors' counsel to contact the trustee to apprise him or her of such pending lawsuits under the circumstances. The purpose of our communication with the Chapter 13 trustee was to make him aware of the existence of the pending fraudulent transfer lawsuit filed by Marion Bank, to inquire how he wished to proceed with respect to the lawsuit, and to offer assistance since our firm was familiar with the facts and underlying documents.

(Doc. 78-18, pp. 7-8, ¶ 23).

On May 3, 2012, Greg filed his Chapter 13 plan. (Doc. 78-19, pp. 52-55).

Under the plan, Greg proposed to pay 100% of the bank's collection judgment over a period of 54 months. (Doc. 78-19, p. 52, ¶ 1).

---

litigation strategy in the fraudulent transfer action against Greg, Reid, and Andrew Tolar, which is described in detail below, as protracted, aggressive, and "out of the ordinary" (Doc. 100, p. 7) (citing Doc. 91-14, pp. 4-5, ¶¶ 7, 9). Ms. McKinney does not provide her testimony based solely on her extensive bankruptcy experience (which Marion Bank cannot challenge simply because it contradicts the testimony of its experts). Instead, Ms. McKinney also bases her testimony on a phone call with Bradley Arant. (Doc. 91-14, pp. 3-4, ¶¶ 6-8). Given Ms. McKinney's position as a staff attorney for the Standing Chapter 13 Trustee and her interactions with Marion Bank's legal representatives, Ms. McKinney has personal knowledge on which to base her assessment that the law firm's call and request were "out of the ordinary" because she "had never had a law firm solicit [her] to represent the Trustee as a client in an individual preference action." (Doc. 91-14, p. 2, ¶ 3). To the extent that Marion Bank disputes the accuracy of Ms. McKinney's characterization of Bradley Arant's conduct as unusual, as previously explained, the Court cannot weigh evidence or assess credibility at the summary judgment stage.

On August 1, 2012, Marion Bank objected to Greg's proposed bankruptcy plan on two grounds. (Doc. 78-19, pp. 57-111). First, it accused Greg of not filing his bankruptcy petition in good faith. (Doc. 78-19, p. 57). Marion Bank was the only creditor, and it characterized Greg's bankruptcy petition as "the latest in a long series of evasive tactics to avoid paying the Judgments owed to [Marion Bank]." (Doc. 78-19, p. 64, ¶ 19). Second, Marion Bank argued that Greg's plan was not in the bank's best interest because the plan did not account for the lost time value of money. (Doc. 78-19, p. 65, ¶ 21). Marion Bank's 55-page objection consists of nine pages explaining the basis for the bank's objections and dozens of pages of attachments. *See* Doc. 78-19, pp. 57-111. Ms. McKinney stated that objections typically are 3-4 pages. (Doc. 91-14, pp. 4-5, ¶ 9). Mr. Nichols could not recall another time that Marion Bank objected to a plan proposing repayment of 100% of the debt owed. (Doc. 78-19, p. 59, tr. pp. 231-32).

On August 17, 2012, Greg filed an adversary proceeding in the bankruptcy court, alleging that Marion Bank violated 11 U.S.C. § 362(a)'s automatic stay by not releasing the March 5, 2012 temporary restraining in the fraudulent transfer action after Greg filed for bankruptcy. (Doc. 78-19, pp. 113-55).

On August 30, 2012, Marion Bank moved for a temporary restraining order and preliminary injunction in the United States Bankruptcy Court for the Middle District of Alabama. (Doc. 78-20, pp. 16-64). Marion Bank sought to enjoin Reid

and the trust from making distributions that were attributable to Greg or Reid's beneficial interest in the trust and from transferring any assets received as distributions from the trust that were attributable to Reid or Greg's beneficial interest. (Doc. 78-20, pp. 16-64; Doc. 78-18, p. 9, ¶ 29).

On September 5, 2012, Marion Bank filed a proof of claim in the amount of $144,430.40 for the judgment against Greg. (Doc. 78-20, pp. 66-68). Marion Bank withdrew the proof of claim and refiled it on September 11, 2012 because the original filing omitted required attachments. (Doc. 78-20, pp. 66-76; Doc. 78-18, pp. 9-10, ¶ 30). Also on September 11, 2012, Marion Bank filed a proof of claim in Greg's bankruptcy proceeding in the amount of $25,650.45 for the judgment against Mr. Livingston and Greg. (Doc. 78-20, pp. 78-86).

On September 17, 2012, the United States Bankruptcy Court of the Middle District of Alabama granted Marion Bank's motion for injunctive relief and preliminarily enjoined the family trust from making distributions to Greg, Reid, or any other person to their benefit. (Doc. 78-20, pp. 88-89). The Bankruptcy Court held that the trust could not make distributions attributable to the 26.7% beneficial interest assigned to Reid under the addendum. (Doc. 78-20, pp. 88-89).

- **Greg's Satisfaction of the Outstanding Judgments**

The following day, on September 18, 2012, Greg offered to settle the fraudulent transfer claim and bankruptcy dispute for the full amount submitted by

Marion Bank in its proofs of claims. (Doc. 78-20, pp. 91-93). On November 1, 2012, bankruptcy court dismissed the case pursuant to the parties' agreement. The agreement provided that Marion Bank would consent to withdrawal of $170,080.85 from the Tolar trust to satisfy the judgments. (Doc. 78-12, pp. 62-64). On December 5, 2012, the parties in the fraudulent transfer action filed a joint stipulation of dismissal of Marion Bank's fraudulent transfer claim. (Doc. 78-20, pp. 99-100).

This lawsuit followed. The Court previously dismissed the Tolars' claims against Bradley Arant and Mr. Taylor. (Docs. 33, 40-41). Only the Tolars' claims against Marion Bank remain.

## III.   DISCUSSION

Title VII prohibits employers from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge . . . under [Title VII]." 42 U.S.C. § 2000e-3(a). The statute permits "a person claiming to be aggrieved" to file a charge with the EEOC alleging that the employer retaliated, and, if the EEOC declines to sue the employer, then the statute permits a civil action to "be brought … by the person claiming to be aggrieved … by the alleged unlawful employment practice." 42 U.S.C. § 2000e-5(b), (f)(1).

The United States Supreme Court has held that Title VII's anti-retaliation provision supplies broad protection from retaliation, including protection from third-party reprisals. *Burlington Northern & Santa Fe Ry., Co. v. White*, 548 U.S. 53, 67 (2006); *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 173-75 (2011). This is so because reprisals against individuals close to victims of conduct that Title VII prohibits may chill a victim's willingness to come forward. Under a third-party retaliation theory, a plaintiff must demonstrate that the defendant subjected him to adverse treatment because of the plaintiff's close association with someone who engaged in protected activity. *See* Doc. 25.

The *McDonnell Douglas* burden-shifting analysis applies to retaliation claims based on circumstantial evidence. *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016). Under this framework, a plaintiff must present evidence to establish a prima facie case of retaliation, which "creates a rebuttable presumption that the employer acted illegally." *Underwood v. Perry*, 431 F.3d 788, 794 (11th Cir. 2005). If a plaintiff establishes a prima facie case, then the employer "may come forward with legitimate reasons" for its conduct to negate the inference of retaliation. If the employer carries its burden, then the plaintiff must "demonstrate, by a preponderance of the evidence, that the employer's reasons are pretextual." *Furcron*, 843 F.3d at 1310-11; *see also Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir. 1997) (The court "must, in view of all the

evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered [nonretaliatory] reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'") (quoting *Cooper–Houston v. Southern Ry. Co.,* 37 F.3d 603, 605 (11th Cir. 1994)).

Though it is one tool for examining circumstantial evidence of retaliatory intent, the *McDonnell Douglas* framework "is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011); *see also Flowers v. Troup Cty., Ga., School Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015). A plaintiff's retaliation claim may survive if the record, viewed in the light most favorable to the plaintiff, "demonstrate[s] a 'convincing mosaic' of circumstantial evidence that warrants an inference" of retaliation. *Lewis v. City of Union City*, --- F.3d ---, 2019 WL 1285058, * 3, n. 6 (11th Cir. Mar. 21, 2019) (*en banc*) (citing *Lockheed-Martin Corp.*, 644 F.3d at 1328); *see also Calvert v. Doe*, 648 Fed. Appx. 925, 929 (11th. Cir. 2016) (applying the "convincing mosaic" standard to a Title VII retaliation claim).[7] Ultimately, retaliatory intent is the crux of the matter, and "[w]hatever form it takes, if the circumstantial evidence is sufficient to raise 'a

---

[7] *Calvert* is not binding authority, but the Court cites the decision for its persuasive value. *See United States v. Rodrigues-Lopez*, 363 F.3d 1134, 1138 n.4 (11th Cir. 2004) ("While unpublished opinions are not binding on this court, they may nonetheless be cited as persuasive authority."); *see also* 11th Cir. Rule 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

reasonable inference that the employer [retaliated] against the plaintiff, summary judgment is improper.'" *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256 (11th Cir. 2012) (quoting *Lockheed-Martin Corp.*, 644 F.3d at 1328); *see also Flowers*, 803 F.3d at 1336 (analysis of "whether the plaintiff has 'create[d] a triable issue concerning the employer's discriminatory intent'" is the "critical decision" in Title VII employment discrimination claims) (quoting *Lockheed-Martin Corp.*, 644 F.3d at 1328).

## A. <u>Standing</u>

### 1. Greg and Andrew are Persons Aggrieved.

Marion Bank argues that Greg and Andrew Tolar lack standing to base a third-party retaliation claim on the bank's state court fraudulent transfer action because the action named Greg and Andrew only in their capacities as trustees, and Title VII does not extend to entities like a trust. Title VII, the bank argues, provides a cause of action to a "*person*" claiming to be aggrieved. (Doc. 85, pp. 24-25; Doc. 86, pp. 29-30) (emphasis in the bank's briefs). Marion Bank relies on *Crawford v. George & Lynch, Inc.* for the proposition that Title VII does not extend to non-person entities like a trust. 2012 WL 2674546, *3 (D.Del July 5, 2012). The Court already has rejected this argument. (Doc. 25, pp. 26-28; Doc. 33, pp. 1-2). As Judge Ott explained, the plaintiff in *Crawford* was a limited liability company, Greg and Andrew Tolar are "natural persons," and "[t]he instant

case, therefore, presents no occasion to weigh in on *Crawford* insofar as its denial of standing rested either upon the fact that [the plaintiff] was an artificial entity or upon the particular nature of the relationship between such an entity and the complaining employee." (Doc. 25, p. 27).

To the extent that Marion Bank argues that Greg and Andrew cannot base their retaliation claims on conduct directed towards the trust, the Court finds the argument unpersuasive. The fraudulent transfer action, though styled as an action against the trust, was designed to secure for the bank payment of Greg's debts on his and Mr. Livingston's defaulted lines of credit. Procedurally, the only way the bank could gain access to funds to which Greg was entitled under the trust addendum was to sue Greg and Andrew in their capacities as trustees. "Title VII's antiretaliation provision prohibits any employer action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination[]'" and "must be construed to cover a broad range of employer conduct." *Thompson*, 562 U.S. at 173-75 (quoting *Burlington*, 548 U.S. at 67). Marion Bank's alleged retaliatory conduct, taken against the trust but directed at Greg and Andrew, falls within the broad range of conduct that Title VII covers.[8]

---

[8] There is no doubt that the bank took legal action to prevent disbursements from the trust to Greg or Reid or anyone else for Greg or Reid's benefit as a means of accessing, figuratively, Greg's wallet. Greg was the target of the bank's conduct, and Andrew and Reid were caught in the mix.

## 2. Andrew is within the "Zone of Interests."

Marion Bank argues that even if Andrew is a person aggrieved within the meaning of Title VII, he nonetheless lacks standing because "he does not fall within 'the zone of interests' intended to be protected by the statute." (Doc. 85, p. 25). Marion Bank argues that Andrew is a distant family member of Ms. Youngblood, citing his deposition in which he testified that he "hardly ever" spoke to Ms. Youngblood. (Doc. 85, pp. 25-26) (citing Doc. 80-1, p. 8, tr. pp. 25-26) ("Maybe at a family gathering if she was there or if she answered the phone somewhere[.]).

The Supreme Court has held that an employer may unlawfully retaliate against an employee under Title VII by targeting a third party who is closely related to the employee. *Thompson*, 562 U.S. at 173-75. Although the Supreme Court found that Title VII covers third-party retaliation, the Court "decline[d] to identify a fixed class of relationships for which third-party reprisals are unlawful." *Thompson*, 562 U.S. at 175. Still, the Supreme Court noted that an action taken against "a close family member will almost always meet the *Burlington* standard, and inflicting a milder reprisal on a mere acquaintance will almost never do so." *Thompson*, 562 U.S. at 175. The Supreme Court "emphasize[d] . . . that 'the provision's standard for judging harm must be objective,' so as to 'avoi[d] the uncertainties and unfair discrepancies that can plague a judicial effort to determine

a plaintiff's unusual subjective feelings." *Thompson*, 562 U.S. at 175 (quoting *Burlington*, 548 U.S. at 68-69 (alteration in original)).

As Greg's brother, Andrew is the first uncle of Ms. Youngblood. Courts generally have found direct relatives to be within the protected zone of interests. *Lewis v. Eufaula City Board of Educ.*, 922 F. Supp. 2d 1291 (M.D. Ala. 2012) (daughter); *Equal Emp't Opportunity Comm'n v. Willamette Tree Wholesale, Inc.*, No. CV 09-690-PK, 2011 WL 886402 (D.Or. Mar. 14, 2011) (brother). Courts also have found non-relatives to be within the protected zone of interests. *Thompson*, 562 U.S. 170 (fiancé); *Lard v. Ala. Alcoholic Beverage Control Bd.*, No. 2:12-cv-452-WHA, 2012 WL 5966617 (M.D. Ala. 2012) (boyfriend); *Ali v. Dist. of Columbia Gov't.*, 810 F. Supp. 2d 78 (D.D.C. 2011) (best friend); *Condiff v. Hart Cnty. Sch. Dist.*, 770 F. Supp. 2d 876 (W.D. Ky. 2011) (stepmother).

From an objective standpoint, an uncle is more like "a close family member" than a "mere acquaintance," and an adverse action against an employer's first uncle *and* the employee's father *and* the employee's brother certainly might dissuade that employee from making or supporting a charge of discrimination. It matters not that Andrew and Ms. Youngblood did not speak often if Marion Bank was not aware the nature of their relationship and did not factor that into its decision. Basing the standing of Andrew and similarly situated third-party plaintiffs on such subjective measures would allow employers to escape third-party

claims after the fact if it turned out that the accused employer misjudged the nature of the relationship.

### B. Prima Facie Case of Third-Party Retaliation

To establish a prima facie case of retaliation under Title VII, a plaintiff asserting a third-party theory of retaliation must show (1) that he has a close relationship with an employee or a former employee of the defendant, and the employee engaged in statutorily protected expression, (2) that the employer took an adverse action against him (the aggrieved plaintiff), and (3) that retaliation against the employee or former employee was the but-for cause of the employer's adverse action against the aggrieved employee. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007) (quoting *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994)); *Univ. of Texas Southwestern Med. Center v. Nassar*, 570 U.S. 338, 352 (2013) (establishing but-for causation standard for Title VII retaliation claims). The Tolars argue that because of their familial relationship to Ms. Youngblood, Marion Bank took various adverse actions against them in retaliation for Ms. Youngblood's decision to pursue an employment discrimination claim against the bank. For the reasons discussed below, the Court finds that the Tolars have not established a prima facie case of third-party retaliation.

### 1. Statutorily Protected Expression

"Statutorily protected expression" consists of either opposition to a practice that is unlawful under Title VII or participation in a Title VII proceeding. 42 U.S.C. § 2000e–3(a). The Tolars' evidence establishes that Ms. Youngblood engaged in statutorily protected activity when she complained of sexual harassment by Mr. Taylor to Marion Bank, filed a charge of discrimination with the EEOC, and filed her Title VII lawsuit. Filing a charge of discrimination with the EEOC or filing a subsequent Title VII lawsuit constitutes statutorily protected participation activity. *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000). Title VII's protections "extend to those who voice informal complaints as well." *Furcron*, 843 F.3d at 1311; *see also Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 n.2 (11th Cir. 2002) ("voicing complaints of discrimination to [] supervisors" constitutes protected activity). As discussed, the relationship between Ms. Youngblood and each of the Tolar plaintiffs is sufficient to make the plaintiffs aggrieved persons for purposes of Title VII. Therefore, the Tolars have satisfied the first element of their prima facie case.

### 2. Adverse Action

To demonstrate an adverse action, the Tolars must show that a reasonable person in Ms. Youngblood's position "would have found the challenged action" by the bank "materially adverse, which in this context means it well might have

dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (internal quotation marks omitted). "[T]he antiretaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace." *Burlington*, 548 U.S. at 57. Rather, "the significance of a retaliatory act depends on the context of the act, and a specific action may be materially adverse in some situations but immaterial in others." *Harris v. Florida Agency for Health Care Admin.*, 611 Fed. Appx. 949, 952 (11th Cir. 2015) (citing *Burlington*, 548 U.S. at 69).

Here, Greg has presented evidence of numerous adverse actions that Marion Bank took against him. The adverse actions largely may be divided into two groups. First, Marion Bank engaged in the aggressive prosecution of a collection action in which it pursued a fraudulent transfer claim under the AUFTA, issued garnishments against the Tolar Family Trust, and objected to Greg's Chapter 13 bankruptcy plan proposing to repay his entire debt over 54 months. In addition, the law firm that defended the bank against Ms. Youngblood's Title VII claim offered to represent the Bankruptcy Trustee in Greg's bankruptcy proceeding. Second, Greg testified that Marion Bank stopped referring legal work to him and discouraged others from using his services. Reid and Andrew have demonstrated that Marion Bank included them as defendants in the fraudulent transfer action,

and Reid has demonstrated that his effort to sit for the Alabama State Bar was hampered because he was a named defendant in the fraudulent transfer action.

Marion Bank argues that the fraudulent transfer claim cannot constitute an adverse action because the Tolars cannot demonstrate that the claim "lack[ed] a reasonable basis in fact or law." *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 748 (1983). The Eleventh Circuit has "observed that a set of actions" may constitute adverse action when considered collectively, even though some actions do not, by themselves, rise to the level of an adverse action. *Harris*, 611 Fed. Appx. at 952 (citing *Shannon*, 292 F.3d at 716 (11th Cir. 2002)). And the Eleventh Circuit has stated that *Burlington* "'strongly suggests that it is for a jury to decide whether anything more than the most petty and trivial actions'" should be considered materially adverse. *Harris*, 611 Fed. Appx. at 952 (quoting *Crawford v. Carroll*, 529 F.3d 961, 973 n. 13 (11th Cir. 2008)). Marion Bank's conduct as to Greg, Reid, and Andrew, when considered collectively and in context, would deter a reasonable employee like Ms. Youngblood from making or supporting a charge of discrimination.

### 3. Causal Connection

A plaintiff may demonstrate a causal relation by showing close temporal proximity between statutorily protected activity and a retaliatory action, but "temporal proximity, without more, must be 'very close.'" *Thomas*, 506 F.3d at

1364 (11th Cir. 2007) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).  A mosaic of circumstantial evidence will suffice to establish causation if the circumstantial evidence raises a reasonable inference that an employer took an adverse action against the aggrieved person to retaliate against the employee who engaged in protected activity.  Regardless of how a plaintiff proves causation, a plaintiff asserting a retaliation claim under Title VII must proffer evidence "that the desire to retaliate was the but-for cause of the challenged [retaliatory] action." *Nassar*, 570 U.S. at 352; *see also Trask v. Secretary, Dep't of Veterans Affairs*, 822 F.3d 1179, 1194 (11th Cir. 2016).  The but-for standard "is more demanding than the motivating-factor standard" that applies in Title VII discrimination claims. *Nassar*, 570 U.S. at 362.  A "'but-for' cause requires a closer link than mere proximate causation; it requires that the proscribed animus have a determinative influence on the employer's adverse" action.  *Sims v. MVM, Inc.*, 704 F.3d 1327, 1335-36 (11th Cir. 2013) (ADEA action); *see also Godwin v. WellStar Health System, Inc.*, 615 Fed. Appx. 518, 526 (11th Cir. 2015) (citing *Sims*) (ADEA action).

The Tolars' claims fail as a matter of law because their evidence does not demonstrate that an effort to retaliate against Ms. Youngblood had a determinative influence upon the bank's actions against them.  The evidence establishes instead that the bank's conduct against Greg, Reid, and Andrew, to the extent that part or

all of it was retaliatory in the Title VII sense, was reprisal for Greg's opposition to unlawful employment practices by the bank's president.  When Greg learned about his daughter's situation at the bank, he did what many fathers would do – he tried to protect her by helping her address the conduct that ultimately led her to file an EEOC charge against the bank and a lawsuit against the bank and Mr. Taylor. Greg and his wife confronted the chair of the bank's board of directors, accused the bank's president of sexually harassing their daughter, and asked the board chair to investigate the allegations against the bank's president.

When Greg engaged in this opposition conduct, he was handling a number of real estate transactions for the bank, and he had served as the bank's attorney in real estate matters for years.  When Greg asked for an investigation into his daughter's allegations against the bank's president, he was not providing legal advice to his client; he was accusing his client of a violation of Title VII.  He told his client that Ms. Youngblood would be filing an EEOC charge not because he wanted to prepare his client to defend the charge but because he wanted the bank to understand the gravity of his request for an investigation.  Greg became adverse to his client, and the dominoes began to fall.[9]

---

[9] It does not matter whether Greg told the board's chairman that Ms. Youngblood was planning to file an EEOC charge or whether Greg stated that he was about to file an EEOC charge on behalf of his daughter.  Ms. Youngblood stated in her affidavit in underlying her Title VII case that following her termination, her father met with Mr. Richardson "as my attorney." (Doc. 91-3, p. 9).  Even if Greg had not mentioned the EEOC charge during his meeting with the board chair, the record establishes that the bank was under the impression that Greg was representing Ms.

Marion Bank stopped referring work to Greg shortly after he complained to the chairman of the bank's board of directors, and the bank told others in the relatively small community of Marion that they should not use Greg's legal services. The financial consequences forced Greg to move his law office to another town and undoubtedly impacted his ability to repay his substantial line of credit that he obtained from the bank before Ms. Youngblood began working for the bank. Greg concedes that the bank was entitled to file a collection action against him.

After the bank obtained a judgment against Greg in the collection action, Greg and the bank, with the assistance of its attorneys, engaged in a legal game of cat and mouse. The bank tried to garnish Greg's income from The Tolar Law Firm LLC, but Greg had dissolved the LLC. Greg created an addendum to the Tolar Family Trust to make his interest in the trust judgment-proof, and the bank filed a fraudulent transfer action, in which Andrew and Reid became entangled. Greg filed a Chapter 13 bankruptcy petition, which the bank's attorneys, viewing the evidence in the light most favorable to Greg, attempted to hijack before Greg's bankruptcy attorney could file a proposed Chapter 13 plan. Seemingly exhausted

---

Youngblood. (Doc. 78-16, p. 5, ¶¶ 10, 13; Doc. 78-17, pp. 4-5, ¶¶ 9, 12; Doc. 78-3, p. 19, tr. p. 70). When asked on what basis the bank had concluded that Greg would be representing his daughter, Mr. Nichols testified in his depositions that he and Mr. Taylor "took [Mr. Richardson's] word for it." (Doc. 78-3, p. 19, tr. p. 70). Thus, the bank understood that Greg was taking a position adverse to the bank's interests.

from the fight, the parties settled the collection matter. Then Greg, Andrew, and Reid sued the bank, the bank's president, and the bank's attorneys in this action.

True, Ms. Youngblood's efforts to obtain Title VII relief from the bank were on a parallel track with the bank's decision to end its attorney-client relationship with Greg and the bank's vigorous collection efforts. But the evidence of Greg's conduct renders the temporal proximity of the parallel narratives insufficient to create a jury question concerning the but-for cause of the bank's conduct toward Greg, Andrew, and Reid.

## IV. CONCLUSION

For the reasons described above, the Court grants Marion Bank's motions for summary judgment. The Court will enter judgment as a matter of law in favor of Marion Bank on Greg, Reid, and Andrew Tolar's claims of third-party retaliation.

**DONE** and **ORDERED** this March 29, 2019.

_____

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE